

**ORDERED in the Southern District of Florida on October 21, 2016.**

_____
**A. Jay Cristol, Judge**
**United States Bankruptcy Court**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 12-19056-BKC-AJC

IN RE:

MAJORCA ISLES MASTER ASSOCIATION, INC.

     Debtor.

_____/

BARRY MUKAMAL, Trustee of the Bankruptcy
Estate of Majorca Isles Master Association, Inc.,

     Plaintiff,                               Adv. No. 14-1142-BKC-AJC-A

vs.

D.R. HORTON, INC., RAFAEL ROCA, AMALIA
PAPADIMITRIOU, CHRISTIAN GAUSMAN and
KARL ALBERTSON,

     Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

    **THIS CAUSE** came before this Court for a three day trial commencing on August 24,

2016, upon Plaintiff Barry Mukamal's First Amended and Supplemental Complaint for

Damages, Deceptive Practices, and Equitable Relief ("Complaint") [D.E. 207] suing D.R. Horton, Inc. (***"D.R. Horton"***) and Rafael Roca, Amalia Papadimitriou, Christian Gausman, and Karl Albertson (collectively, ***"Individual Defendants"***) and Defendants' claim for Setoff and Counterclaim [D.E. 213].

The trial of this case tells a modern day story of David and Goliath. Goliath is D.R. Horton, a New York Stock Exchange company and self-described largest residential developer in America. David is Debtor Majorca Isles Master Association, a homeowners association created by D.R. Horton pursuant to Florida Statute Chapter 720 to represent the interests of unit owners in an originally planned 681 unit project which D.R. Horton called Marjorca Isles, located in Miami Gardens, Florida. Majorca Isles was and is a low to moderate income residential community.

In about 2005, D.R. Horton began a project to construct and sell 681 condominium units and single family homes in Miami Gardens, Florida. The project contemplated about 40 condominium buildings consisting of about 9 condominium associations and a homeowners association named Majorca Isles Master Association. The project was to include two swimming pools, two clubhouses, as well as security. Three hundred forty (340) condominium units in building phases I, II, III, IV and V were constructed by about 2009. The units sold for an average of about $300,000 or more and were generally financed by mortgages from the Federal Housing Authority. Ultimately, three hundred fifty-five (355) units were sold.

As was customary pursuant to Chapter 718 and Chapter 720, Florida Statutes, D.R. Horton created five (5) condominium associations and a master homeowners association, all of which D.R. Horton controlled. D.R. Horton appointed four of its employees as directors of the condominium associations and the homeowners association.

As required by Florida Statute Chapter 718 and 720, Florida Statutes, D.R. Horton began paying the monthly maintenance obligation on the unsold units and paid deficit funding on the project while it still controlled the associations, pending turnover of the associations to the unit owners.

Along came the economic recession. Condominium sales slowed and stopped. With no market, D.R. Horton stopped building, with 355 units completed, and it withdrew the remaining portion of the Majorca Isles project – which it had every legal and contractual right to do.

Because of the economic downturn and loss of jobs, many condominium owners were not paying their monthly maintenance assessments. Debtor had a need for about $40,000 a month to pay its obligations and only $20,000 a month was coming in. The collections of both the condominium associations and the master homeowners association monthly maintenance payments were being made by the five condo associations, and they were obligated to forward the master homeowners association portion of the assessments to the Debtor. However, there was not enough income to cover the condominium association expenses and the master homeowners association expenses.

A conflict of interest thereupon developed for Rafael Roca, Amalia Papadimitriou, Christian Gausman, and Karl Albertson, employees of D.R. Horton who were Horton-appointed directors of the condominium associations and the master homeowners association. At this point, they were wearing three hats: D.R. Horton employees, homeowners association directors and condominium association directors. They owed a duty to the condominium associations and a conflicting duty to the master homeowners association where they were also directors. They decided to favor the condominium associations over the homeowners association and diverted

funds due the homeowners association to condominium association expenses, thereby breaching their fiduciary duty to the homeowners association.

To a point, D.R. Horton was fulfilling its obligation to deficit fund the condominium association and homeowner association expenses. However, this was a sad economic time and Horton was facing losses on the Majorca Isles project. Condominium purchasers who bought units at $300,000+ were each facing unrealized losses of from $180,000 to $220,000 on each unit. At this time, the Miami-Dade County property appraiser valued the units purchased from D.R. Horton for $300,000 or more, at between $80,000 and $120,000.

When it appeared that the deficit funding obligation to D.R. Horton was reaching $50,000 per month, D.R. Horton, through its employees, decided to shift the economic loss of D.R. Horton to the homeowners by cutting services and amenities which the homeowners were entitled to receive and stopping the deficit funding that D.R. Horton was obligated to supply.

These actions by D.R. Horton can only be classified somewhere between not nice and evil. The responsibility for D.R. Horton's actions is on D.R. Horton by virtue of D.R. Horton's employees Rafael Roca, Amalia Papadimitriou, Christian Gausman, and Karl Albertson wearing their three hats, as D.R. Horton employees and agents [for which their acts are the responsibility of D.R. Horton under *respondeat superior*], and as directors who controlled both the condominium associations and the master homeowners association.

In the face of the losses on the project, D.R. Horton implemented turnover of the associations and cast off the condominium associations and the homeowners to fend for themselves.

Soon after turnover, the gaping holes in the funding became readily apparent.  With insufficient funds to timely pay its obligations, the master homeowners association filed this Chapter 11 case and Barry Mukamal became the Trustee.

It is important to recognize and comment upon the actions of the Chapter 11 Trustee, Barry Mukamal, because what he did here was extraordinary.  Mr. Mukamal was appointed in a case with no assets and no cash.  He could not have been criticized for performing a minimum amount of trustee's duties with prospect of little or no compensation.  Instead, he saw the Debtor not as a defunct corporate entity, but as an association representing 355 low or moderate income families not capable of fending for themselves against a multi-million dollar financial giant.  Barry Mukamal took it upon himself to expend hundreds of thousands of dollars, which might never be reimbursed to him, to investigate and prepare a lawsuit to provide a remedy for a wrong perpetrated by a greedy corporate giant.  He is to be praised for his selfless conduct as a trustee acting in the finest tradition of a fiduciary.

In the end, the Court wonders why this case came to trial, as the Defendants failed to present any credible evidence in defense of the allegations in the Complaint.  The testimony of the Defendants and their experts irrefutably support the Trustee's case.  Karl Albertson, for example, admitted he and D.R. Horton were aware of the obligations that the Local Associations owed to the Master Association and that the Master Association owed to the unit owners under the condominium documents but disregarded those duties and obligations.  Likewise, the testimony of Amalia Papadimitriou, while intentionally evasive, revealed she knew of her responsibilities and fiduciary duties as a Board member of the Master Association and intentionally breached those duties, for D.R. Horton's benefit and financial gain. Even Craig Vaughn's testimony, on behalf of Castle Management, supported the Trustee's case.

Additionally, the testimony of Steven Gladstone, CPA during his cross-examination highlighted the inaccurate and manipulative accounting that D.R. Horton used to reclassify debt to avoid paying its obligations to the Master Association. Finally, for some unexplainable reason, the Defendants offered Viresh Dayal, CPA to provide expert testimony; however, Mr. Dayal offered no relevant testimony regarding any of the evidence admitted at trial. He was not credible or coherent and his testimony proved worthless.

It is against this backdrop, and upon thorough consideration of the evidence adduced at trial and observation of the candor and demeanor of the witnesses, that the Court makes the following findings of fact and conclusions of law in conformity with Rule 52(a)(1) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## **FINDINGS OF FACT**

### ***Majorca Isles is Developed by D.R. Horton***

D.R. Horton is the largest residential homebuilder in the United States**.** (Pl. Ex. 135 at P. 93, L.10-11; Tr. 242, L. 7-12).[1] In 2005, D.R. Horton planned, developed, and began construction of Majorca Isles, a sprawling community of five condominium phases which were to be comprised of forty (40) buildings located in Miami Gardens, Florida, with the intent of selling condominium units to the consuming public. (Tr. 27). Each phase of Majorca Isles was set up to be independently controlled by its own condominium association. At all times material, each individual phase condominium association has been responsible for the maintenance of its own common area, as governed by each phase association's declaration of condominium and

---

[1] Plaintiff's Exhibits shall be referred to as (Pl. Ex. _) and Defendants' Exhibits as (D. Ex. _). Specific page references shall be identified as (P._) and line references as (L._), so that lines two through six of Exhibit 151 would be referred to as (Pl. Ex. 151, P. 30, L. 2-6). The transcript of the proceedings shall be referred to as (Tr. at P. ___, L. ___).

bylaws.  The five local associations are identified as Majorca Isles I Condominium Association, Inc. ("***Majorca I***"), Majorca Isles II Condominium Association, Inc. ("***Majorca II***"), Majorca Isles III Condominium Association, Inc. ("***Majorca III***"), Majorca Isles IV Condominium Association, Inc. ("***Majorca IV***"), and Majorca Isles V Condominium Association, Inc. ("***Majorca V***") (individually, ***"Local Association"*** and collectively, "***Local Associations***"). D.R. Horton formed the first Local Association, Majorca I, on February 24, 2006.  D.R. Horton subsequently formed the remaining associations as construction and sales of each phase progressed.

### *The Majorca Isles Master Association*

In addition to the Local Associations, D.R. Horton also formed the Majorca Isles Master Association, Inc. ("***Master Association"***) a Florida not-for-profit corporation, on February 24, 2006. D.R. Horton memorialized the rights and obligations of the Master Association in two principal documents:  (a) the Declaration of Master Association, Covenants, Easements and Restrictions for Majorca Isles ("***Master Declaration"***) (Pl. Ex. 1); and (b) the Bylaws of the Majorca Isles Master Association, Inc. ("***Master Bylaws"***) (Pl. Ex. 2).  The Master Declaration details the rights and obligations of the Master Association as it relates to Majorca Isles.  The Bylaws of the Majorca Isles Master Association, Inc. govern the operation and conduct of the Master Association and its board of directors (collectively, ***"Board of Directors"*** and individually, ***"Director"*** or ***"Directors"***).

Since its inception, the Master Association has been responsible for the maintenance, repair, operation, and management of all common areas and improvements of Majorca Isles, as specifically identified in the Master Declaration.  The Master Association common areas and improvements include, but are not limited to, all recreational facilities (including swimming

pools and clubhouses), lakes, landscaping, parking areas, paving, irrigation systems, gate facilities, perimeter walls, and sidewalks.

### *Individual Defendants Served on the Board of Directors*
### *of the Master Association and the Local Associations*

Pursuant to the terms of the Master Declaration and Master Bylaws, the Master Association was controlled and operated by its Board of Directors.   (Pl. Ex. 1 at section 3.2; Pl. Ex. 2 at 4.01).  At all times material, the Board of Directors has been the ultimate authority of the Master Association, responsible for overseeing all aspects of the association, including finances, management, the employment of a professional property manager, the hiring and management of legal counsel, setting policy, enforcing the Master Declaration, and ensuring the proper operation of the Master Association pursuant to the Master Declaration and Master By-Laws.  *Id.*

On February 24, 2006, D.R. Horton, as the developer, appointed the Directors pursuant to the authority of the Master Bylaws and Florida law and continued to appoint the Directors until the Master Association was turned over to the unit owners (*"turnover"*) on or about January 11, 2011.[2] [D.E. 213 at ¶ 29).  Each of the Directors that D.R. Horton appointed to the Board of Directors was also a management level or supervisory employee of D.R. Horton. (Tr. 240-42). These D.R. Horton-appointed Directors include each of the Individual Defendants, who were acting as agents on behalf of D.R. Horton.  [D.E. 213 at ¶¶ 28-29].

At all times material, the Individual Defendants acted as agents of D.R. Horton, within the scope of their employment and for the benefit of D.R. Horton and under the direct or tacit

---

[2] While Defendants seemed confused as to the date of turnover, claiming different dates for turnover, it was either January 11, 2011 as indicated in discovery or January 27, 2011 as indicated in Defendants' July 16, 2016 Answer, Affirmative Defenses to the Second Amended Complaint, Setoff and Counterclaim [D.E. 213] . The exact date in January 2011 is not material.

instruction of D.R. Horton.  D.R. Horton is therefore liable for the acts and omissions of its employees in their capacity as Directors of the Master Association.

With respect to the Individual Defendants:

a.    From February 2, 2009 until turnover on or about January 11, 2011, Defendant Roca was an employee of D.R. Horton and the city manager and later president of the South East Region for D.R. Horton and, at the same time, he was an appointed member of the Board of Directors of the Master Association [D.E. 213 at ¶¶ 28-29] (Pl. Ex. 137 at P. 14-16);

b.    From April 17, 2008 until turnover on or about January 11, 2011, Defendant Papadimitriou was an employee of D. R. Horton and legal counsel of the South East Region for D.R. Horton and, at the same time, she was an appointed member of the Board of Directors of the Master Association [D.E. 213 at ¶¶ 28-29](Pl. Ex. 136 at P. 153, 175-76);

c.    From inception of the Master Association on February 24, 2006 until turnover on or about January 11, 2011, Defendant Albertson was an employee of D. R. Horton and land acquisitions manager of the South East Region for D.R. Horton and at the same time, he was an appointed member of the Board of Directors of the Master Association [D.E. 213 at ¶¶ 28-29] (Pl. Ex. 151, p. 6); and

d.    From inception of the Master Association on February 24, 2006 until April 17, 2008, Defendant Gausman was an employee of D. R. Horton and chief financial officer of the South East Region of D.R. Horton, and at the same time, he was an appointed member of the Board of Directors.  Mr. Gausman continued as the chief financial officer of the South East Region after his board service as a Director of the

Master Association terminated through at least turnover on or about January 11, 2011 [D.E. 213 at ¶¶ 28-29](Pl. Ex. 139 at P. 7, 12).

In addition to the Master Association, D.R. Horton also appointed each of these individual Defendants to serve as directors of the five Local Associations.

In large part, D.R. Horton created the obligations that its Directors' owed the Master Association, by creating the Master Declaration and Master Bylaws, both of which governed the Master Association. Thus, D.R. Horton and its employees, including the Individual Defendants, as agents of D.R. Horton, had knowledge of the obligations and responsibilities imposed by the documents governing the Master Association.

During the period of time that Defendant Roca was a Director of the Master Association, D.R. Horton appointed him to the board of directors of the following Local Associations:

    a.      Majorca Isles III from February 21, 2009 until on or about August 2009;

    b.      Majorca Isles IV from February 21, 2009 until on or about April 2010; and

    c.      Majorca Isles V from October 15, 2009 until on or about January 11, 2011. [D.E. 207, ¶ 56; D.E. 213, ¶ 56]

2.      During the period of time that Defendant Papadimitriou was a Director of the Master Association, D.R. Horton appointed her to the board of directors of the following Local Associations:

    a.      Majorca Isles III from April 17, 2008 until on or about August 2009;

    b.      Majorca Isles IV from November 27, 2007 until on or about April 2010; and

    c.      Majorca Isles V from October 15, 2009 until on or about January 11, 2011. *Id.*

During the period of time that Defendant Albertson was a Director of the Master Association, D.R. Horton appointed him to the board of directors of the following Local Associations:

     a.     Majorca Isles I from February 24, 2006 until on or about May 9 , 2007;

     b.     Majorca Isles II from August 31, 2006 until on or about November 6, 2007

     c.     Majorca Isles III from March 28, 2007 until on or about February 21, 2009;

     d.     Majorca Isles IV from November 27, 2007 until on or about February 21, 2009; and

     e.     Majorca Isles V from October 15, 2009 until on or about January 11, 2011. *Id.*

During the period of time that Gausman was a Director of the Master Association, D.R. Horton appointed him to the board of directors of the following Local Associations:

     a.     Majorca Isles I from February 24, 2006 until on or about May 9 , 2007;

     b.     Majorca Isles II from August 31, 2006 until on or about November 6, 2007; and

     c.     Majorca Isles III from March 28, 2007 until April 17, 2008. *Id.*

Due to their concurrent directorships, each of the Individual Defendants was obligated to fulfill his or her fiduciary obligations as a member of the board of directors to both the Master Association and multiple Local Associations, while also owing a fiduciary duty to his or her employer D.R. Horton.  This is not uncommon in condominium developments and is no problem as long as no conflict of interest develops or exists.

However, conflicts of interest did, in fact, arise with respect to these various fiduciary obligations they had to multiple entities, as became clear during their testimony at trial. For instance, Karl Albertson candidly admitted he recognized his conflicting duties to the associations and to D.R. Horton, but claims he prioritized his duties by "practically managing" them. His testimony revealed that he and D.R. Horton were well aware of the obligations that the Local Associations owed to the Master Association and that the Master Association owed to the unit owners under the controlling condominium documents but they disregarded those obligations, failing to collect dues from the Local Associations and failing to provide services and amenities to the unit owners. Mr. Albertson's testimony was forthcoming and credible and wholly supported Plaintiff's case, to wit, the Defendants breached their fiduciary duties to the Debtor and the unit owners for the benefit of D.R. Horton.

The testimony of Amalia Papadimitriou also revealed the conflict of interest that existed among the Board of the Master Association and the Local Associations, and the consequential breaches of the Board's fiduciary duties. Ms. Papadimitriou was not forthcoming or credible, especially for a lawyer and officer of the Court. Yet despite her evasiveness, the Court believes Ms. Papadimitriou's testimony revealed she indeed knew of her responsibilities and fiduciary duties as a Board member of the Master Association and intentionally breached those duties, for D.R. Horton's benefit and financial gain. She admitted the Board of the Master Association did what was "necessary" notwithstanding the Board's obligations.

### D.R. Horton Controlled the Master Association Operations

At all times material, D.R. Horton controlled the Master Association, through its agents and employees, including but not limited to the Individual Defendants, all of which acted within the scope of their employment and on behalf of D.R. Horton. As D.R. Horton's corporate

representative testified, at all times material D.R. Horton was knowledgeable of the operations, finances, and issues at Majorca Isles and the Master Association. (Tr. 240, 242). There was no evidence introduced that D.R. Horton ever objected, corrected, or otherwise failed to fully ratify the conduct of its employees and agents, as it relates to the operation of the Master Association.

### *The Master Association Assessments and Its Financial Recordkeeping Obligations*

The Master Declaration provided that each unit owner in Majorca Isles was obligated to pay the Master Association, and the Master Association was entitled to collect, periodic assessments (**"Assessments"** or **"Master Association Assessments"**) for the maintenance, operation, management, and insurance of the common areas under the control of the Master Association (Pl. Ex. 1 at Section 6.1, 6.12, and 6.13). The Master Declaration also empowered the Master Association with several significant rights to protect its lawful interest in the unit owners' payment of Assessments, including, but not limited to, imposing continuing priority liens on units upon nonpayment of delinquent assessments, including late charges, interest, and the cost of collection (*Id.* at Section 6.10-13). The Master Association was also empowered with the right to foreclose on such liens and take legal action for damages against homeowners for unpaid, delinquent assessments. *Id.*

At all times material, the Master Association was required to maintain complete and accurate records of the Assessments as to each individual unit owner. Pursuant to the Master Bylaws, the Master Association was obligated to maintain "financial and accounting records . . . according to good accounting practices." These records included "[a]ccurate, itemized, and detailed records of all receipts ..." (Pl. Ex. 2 at section 5.11.09).

As to the unit owners, the Master Association was required to maintain detailed records that were defined as a:

> current account and a periodic statement of the account for each
> Member of the Master Association, designating the name and
> current address of each Member who is obligated to pay
> assessments, the due date and amount of each assessment or other
> charge against the Member, the date and amount of each payment
> on the account, and the balance due.

*Id.* The term "Member" is defined to include all unit owners. *(Id.* at 3.01)

The Master Declaration also imposed a need for accurate financial records of the individual unit owner's assessments. The Master Declaration provides that the:

> Master Association shall upon demand at any time furnish to any
> Owner liable for an assessment a certificate in writing signed by
> an officer of the Master Association setting forth whether such
> assessment has been paid as to any particular Lot or Unit. Such
> certificate shall be conclusive evidence of payment of any
> assessment to the Master Association therein stated to have been
> paid.

(Pl. Ex. 1 at Section 6.09). Further, the Master Declaration required the Directors of the Master Association to "prepare a roster of the Lots and Units, the Owners thereof and assessments applicable thereto, which shall be kept in the office of the Master Association and shall be open to inspection by any Owner." *Id.*

The D.R. Horton-appointed Directors, including the Individual Defendants acting as agents of D.R. Horton, who were charged with the management and affairs of the Master Association, were responsible for ensuring that the Master Association maintained the financial records of the assessments, as mandated by the Master Bylaws (P. Ex. 2 at 4.01). The need for these financial records would become apparent when the D.R. Horton-appointed Board attempted to investigate its options to collect Assessments.

### *The Inadequate Financial Record Keeping*

The D.R. Horton-appointed Directors, including the Individual Defendants acting as agents of D.R. Horton, disregarded the clearly-stated requirements to maintain detailed and

accurate financial records as to each unit owners' Assessments in accordance with the Master Declaration and Master Bylaws.

**No Financial Record Keeping in 2006-2007**

Initially, the D.R. Horton-appointed Directors ignored the requirement to institute financial recordkeeping, by failing to create and maintain any financial recordkeeping whatsoever. D.R. Horton commenced the sale of units at the Master Association in or about March 2006, but no financial records were maintained by the Master Association. For example, the Master Association Financial Statement for the period ending August 31, 2006 shows assessments collected and expenses incurred, but no record of the collections (Pl. Ex. 4 at Income/Expense Statement). For a period of approximately eighteen (18) months, the Master Association, under the direction of the D.R. Horton-controlled Board of Directors, including Individual Defendants, failed to create and maintain any financial records of the Assessments (Tr. 407-408). As a result, there is no record of charges or collection of Assessments that exists for the period between March 2006 and October 2007.

Due to this complete recordkeeping failure, the Master Association was, and continued to be, deprived of fundamentally necessary information, including: a) which unit owner was assessed; b) during which period each unit owner was assessed; c) which Assessments were paid by the unit owner; d) the total amount of Assessments collected from each unit owner; and e) the total amount of delinquent assessments due and owing from each unit owner, including late fees, interest and the costs of collection.

While one of Defendants' principal contentions is that the financial issues at the Master Association were due to an economic decline, that argument is belied by the fact that in 2006 and 2007 -- prior to the 2008 economic decline -- Defendants failed to keep any record of

Assessments due from the unit owners.  Consequently, the D.R. Horton-appointed Board, acting as agents for D.R. Horton abandoned any effort to account for at least 16 months of Assessments.

### D.R Horton Begins Bulk Billing in October 2007

Beginning on or about October 1, 2007, the D.R. Horton-controlled Board of Directors acting as agents of D.R. Horton, and with D.R. Horton's knowledge chose to employ a method of "bulk billing" for the purpose of collecting and accounting for Master Association assessments  (Tr. 238).  The bulk billing method simply totaled all of the monthly Assessments for the unit owners of a specific Local Association, which was recorded as a single, undefined "bulk" charge from the Master Association to each Local Association.  Likewise, any payments for assessments received by the Master Association, from a Local Association were also recorded in bulk, with the Master Association recording a single total "bulk" payment from a Local Association for the Assessments (Tr. P. 238; Pl. Ex. 50). Due to the D.R. Horton-controlled Board of Directors' failure to maintain any financial records prior to October 1, 2007, once the bulk billing was instituted, the Directors simply started with a beginning balance of $0.00, ignoring any monies owed prior to that date and abandoning any effort to provide a detailed financial accounting of all unit assessments owed to the Master Association during that period (Pl. Ex. 50).  This failure occurred despite the repeated and plain language requirements set forth in the Master Declaration and the Master Bylaws; the Master Association bulk billing records were completely devoid of any of the required information about the individual unit owners' payments or the status of their Assessments.

During this period, D.R. Horton began with no financial recordkeeping of Assessments, and then eighteen (18) months later commenced with the bulk billing method from scratch,

resulting in a failure to fulfill the Master Association's obligations, in that they:

        a.      **Did not** include a current roster of the Members, their mailing addresses, lot or unit identifications and telephone numbers as required by Section 5.11.06 of the Master Bylaws;

        b.      **Did not** include "[a]ccurate, itemized, and detailed records of all receipts…" as required by Section 5.11.09(A) of the Master Bylaws;

        c.      **Did not** include a "current account and periodic statement of the account for each Member of the Master Association, designating the name and current address of each Member [ ], the due date and amount of each assessment or other charge against the Member, the date and amount of each payment on the account, and the balance due" as required by Section 5.11.09(B) of the Master Bylaws;

        d.      **Did not** include "an Assessment Roll for each Member, designating the name and current mailing address of the Member, the amount of each Assessment payable by each Member, the dates and amounts in which the Assessments came due, the amounts paid upon the account of the Member, and the balance due" as required by Section 8.02.03 of the Master Bylaws; and

        e.      **Did not** include "a roster of the Lots and Units, the Owners thereof and assessments applicable thereto, which shall be kept in the office of the Master Association and shall be open to inspection by any Owner" as required by Section 6.09 of the Master Declaration.

The bulk billing records also failed to indicate the amount that each Local Association collected in total lump sum assessment payments, of which the first dollar was required to be paid to the Master Association until it was paid in full for its Assessments (Pl Ex. 50).

Due to the failure to create and maintain the financial records required by the Master Bylaws and Master Declaration, the Master Association was unable to determine the most fundamental information concerning the Master Association Assessments, as required by the Master Bylaws, including: a) which unit owners were obligated to pay the Assessments; b) which unit owners, if any, had paid their Assessments; c) which unit owners, if any, were delinquent in the payment of Assessments; and d) the status of each unit owner's account. Further, the Master Association was unable to certify each unit owner's account status, or maintain a roster of unit owners for inspection as required by the Master Declaration (Tr. 32, L. 6 – P. 33, L.21).

The D.R. Horton-appointed Directors and Individual Defendants knew that readily accessible, detailed financial records existed at all times (Tr. 407-10) but instead chose to bulk bill the Local Associations.  The Master Association's own property management company conceded that the bulk billing records made it impossible to reconstruct the Master Association individual unit owners' ledger to determine who paid and who did not (Pl. Ex. 73), but the D.R. Horton-appointed Directors elected to use bulk billing.  The Local Associations each maintained detailed records of each unit owners' contact information, assessments broken down by Master Association Assessment and Local Association assessments, payments, charges, and account balance. *Id.*  These Local Association financial records were representative of the type of minimum information that the Master Association was required to maintain for itself pursuant to the Master Declaration and Master Bylaws.  Despite the fact that the D.R. Horton-appointed Master Association Board of Directors had actual knowledge that its property management company could and did produce detailed financial records for Local Associations, the Master Association chose to use the completely inadequate form of bulk recordkeeping and never made

an effort to correct it. *Id.*    The D.R. Horton-appointed Board never asked the property management company to create suitable financial records, even after outside counsel indicated that he could not engage in collections without the information and the information was easily available to the D.R. Horton-controlled Board if it would have asked (Tr. 409, L. 9-23; Tr. 410, L. 14 – P. 411, L. 10).

As a result of the bulk billing, when the Defendants decided to finally consider engaging in any collection efforts, Defendants were unable to pursue collections of the aged receivables because they did not have the records necessary, as explained to them by their legal counsel.

### *Delegation of Collection Rights to the Local Association and the Master Association's First Right to Collected Sums*

The Master Declaration provided the Master Association with the right, but not the obligation, to delegate collection of the Master Association Assessments to the Local Associations (Pl. Ex. 1 at section 6.2).    Pursuant to that authority, the Master Association delegated the collection of Master Association Assessments to the Local Associations then in existence -- Majorca Isles I, II, and III. Later, the Master Association also delegated to Majorca Isles IV and V the responsibility of collecting the Master Association assessments after those associations were formed, in March 2008 and June 2010, respectively.

In addition to the Assessments due the Master Association, each unit or lot owner was obligated to pay its governing Local Association a separate periodic assessment.    The Master Declaration unequivocally provided that:

> In the event that the assessments received by each Local Association for itself and for the Master Association are received in a lump sum and such sum is less than sufficient to pay both entities, the amount collected shall be applied first to the assessments of the Master Association, and then to those of the Local Association (**The Master Association to be paid in full before the Local Association is paid).**

(Pl. Ex. 1 at section 6.12)(emphasis added). Each Local Association therefore billed each unit owner a monthly lump sum for the total of the Master and Local Association assessments due.

### ***The Master Association Failed to Collect Assessments Collected by Local Associations.***

Almost immediately after being instructed to collect the Master Association Assessments, the Local Associations failed to remit any funds collected to the Master Association.  The Parties stipulated that during the period that the Local Associations were controlled by D.R. Horton and collecting the Assessments, they failed to remit $228,967.57 to the Master Association (more than 45% of the amount assessed), even though sufficient funds were collected to pay the Master Association Assessments in full.  None of the Local Associations, while they were controlled by D.R. Horton, remitted all of the collected Assessments to the Master Association.  In fact, the Master Association records do not show Majorca I and II, while under the control of D.R. Horton, remitting any Assessments to the Master Association.

By failing to collect these Assessments and allowing the Local Associations to retain those collected funds, the D.R. Horton-appointed Board, acting as D.R. Horton's agents and for its benefit, chose the best interests of the Local Associations over the interests of the Master Association.  The D.R. Horton-appointed Board made the conscious decision to saddle the Master Association with the debt resulting from the non-collection from the Local Associations. As Defendant Albertson testified:

> Q.  Because you will agree with me that prior to September 2009, there was no effort to collect those funds by the Master Association as to the Local Associations, was there?
>
> MR. DAMIAN, JR.:  Object to the form.
>
> THE WITNESS:  By the Master, no.

Q.  So by D.R. Horton funding the Local Associations, as I understand you, the burden to repay D.R. Horton now falls upon the Master Association?

A.  Yes.

Q.  And if the Master Association had collected the assessments and D.R. Horton had elected to pay the Local Associations -- or to fund the Local Associations, then they would have owed D.R. Horton this money; is that what you're saying?

A.  In a sense, yes.

Q.  So there was a choice between the Local Associations and the Master Association, right?

A.   Right.

(Pl. Ex. 138 at P. 86-87).

The growth of the uncollected sums was explosive.  The unpaid assessments listed as approximately $33,000 at the end of 2007 had grown to over $308,000 one year later, as of December 31, 2008. (Tr. 58).  At the same time, the finances were so confusingly intertwined they could not be unraveled. As the Master Association property management company explained, "The master was partially funded by the subs as monies became available.  For instance, if $10,000 was due to be collected, but only $5,000 was in the sub's account, then a portion of that was paid to the master and a portion used to pay the sub's invoices.  Because of the partial payments, it would be impossible to identify which owners' ledgers paid and which did not."  (Pl. Ex. 73).

Because of their failure to act, the Individual Defendants, as members of the D.R. Horton-controlled Board of Directors, allowed the amount of Assessments unpaid by the Local Associations to grow at a massive rate, as demonstrated by the following:

a.  Majorca Isles I failed to pay the Master Association $187,147.72 in Assessments for the period from October 2007 to September 2009;

b.  Majorca Isles II failed to pay the Master Association $142,367.07 in Assessments

for the period from October 2007 to September 2009;

    c.   Majorca Isles III failed to pay the Master Association $77,597.30 in Assessments

        for the period from October 2007 to September 2009; and

    d.   Majorca Isles IV failed to pay the Master Association $43.35 in Assessments for

        the period from Marc 31, 2008 to September 2009.

In this two-year period of bulk billing, from October 2007 to September 2009, the unpaid Assessments grew to $407,055.44.  (Pl. Ex. 55).

### *Deficit Funding*

While D.R. Horton controlled the Master Association, it was obligated to fund the minimum financial contributions necessary to sustain Master Association operations, which is termed "deficit funding".  *See* Master Declaration at Section 6.4; Section 720.308, Florida Statutes.  D.R. Horton elected deficit funding from the options that were available under the Master Declaration and Florida Statutes.  As D.R. Horton's corporate representative testified:

Q.   And there was – and you understand, however that you calculate it, that the company that you work for while you were on the board of Majorca Isles Master Association had an obligation to pay the expense that they were not – that was not being collected and they weren't making an effort to collect, right?

A. Yes.

(Tr. 288, P. 288, L. 21 – P. 289, L. 2).

D.R. Horton's motivation in deficit funding was to keep Majorca Isles operating in order to continue construction and sales (Tr. 234-35).  It was in D.R. Horton's best interest to sustain the highest possible market value of its unsold units, so that it could sell them to the consuming public (Tr. 235).

The amount necessary to deficit fund the Master Association was an absolute bare minimum, less than the amount of the Assessments. The Master Association's outside legal counsel opined that D.R. Horton was obligated to deficit fund between revenue and actual expenses (Pl. Ex. 76 at P. 3). This was the only documentary evidence or evidence of specific advice provided to the D.R. Horton-appointed Directors introduced at trial.

Due to D.R. Horton and its appointed Directors' failure to record or collect Assessments, the amount that D.R. Horton had to deficit fund skyrocketed and D.R. Horton looked for ways to cut its costs at the Master Association's expense. On September 17, 2009 more than a year before turnover, the D.R. Horton Division CFO was asked when he could fund the Master Association so it could pay critical bills and Mr. Gausman, responded:

> This is a problem. Majorca Master has gone through another $50K in a month. We can't fund this HOA $50K a month. I suggest that if the sub-associations have stopped funding the master, that we cut off the services. How long before the turnover of the sub-associations to the homeowners or the state?

(Pl. Ex. 55). In response, the property management company blamed the "problem" on the fact that the Local Associations had not remitted $407,055.44 in Master Association Assessments. *Id*. These were the same Assessments for which there was no meaningful evidence of collection activity or write-offs as bad debt, but were still listed on the financial statements as assets.

After further discussion and analysis, on February 16, 2010, the Master Association's outside counsel advised D.R. Horton that the uncollected Assessments that had been bulk billed to the Local Associations was a "deficit funding obligation" of D. R. Horton (Pl. Ex. 8 at P. 2). In response, D.R. Horton and the Directors it appointed did nothing (Tr. P. 255). These deficit funding obligations were not paid by D.R. Horton. Instead, the very same amounts that were a

deficit funding obligation continued to be listed as accounts receivable and assets on the Master Association balance sheet (Pl. Ex. 21).

### *Calculation of Budgets*

D.R. Horton and the Individual Defendants, acting as its agents and on its behalf, manipulated the annual budgets to materially understate the amount of expenses and create a monthly assessment that D.R. Horton knew was insufficient to fund the operations of the Master Association. (Tr. P. 242). This was accomplished in two ways: a) understating the calculated bad debt in the form of uncollectable assessments; and b) basing the per unit assessment on spreading the expenses over 681 units, hundreds of which were not and would not ever be built.

With respect to the understatement of uncollectable assessments, D.R. Horton and the Individual Defendants, acting as its agents and on its behalf, knew that there were significant calculated bad debt expense items for both 2008 and 2009. In 2009, they calculated the bad debt at $287,122 (Pl. Ex. 29). This was the amount that D.R. Horton did not expect to collect from the Local Associations. However, after various versions of proposed budgets, including ones with a portion of that bad debt, the D.R. Horton-appointed Board produced a budget with zero bad debts (Pl. Ex. 39). The effect of that was to materially understate the monthly amount of Assessments that could possibly be collected and materially misstate the amount necessary to fund the operations of the Master Association.

D.R. Horton's corporate representative conceded that the Board knew that the budgets were inadequate to fund the operation of the Master Association, even if 100% of the sums charged were collected (Tr. 271).

In 2010, Master Association bad debt was calculated at $393,093 (Pl. Ex. 41). Ultimately, the line item expense, entitled "Unpaid Maintenance/Delinquent Accounts", was

reduced by an unexplained journal entry of 50% to $196,516.  This resulted in a material understatement of the Unpaid Maintenance/Delinquent Accounts budgetary line item alone by $196,516.

As to the calculation of the Assessments, D.R. Horton and the Individual Defendants, acting as its agents and on its behalf, used budgets that spread the monthly expenses over 681 units, approximately twice as many units as actually constructed and available to pay assessments  (Tr. 46).  The draft budgets for 2009 are illustrative because they included a version calculated on 339 existing units and, on the same date, another draft budget based on 681 units consisting of 342 unbuilt, mythical units and 339 actual units  (Pl. Ex. 28).  The line items of each were identical in all material respects.

The property management company calculated that the 2009 abated operational budget for the 339 units would total $1,080,045 or $266.97 per unit per month with reserves.  Meanwhile, the operational cost for the 681 units was only $1,364,792 or $167.74 per unit per month with reserves (Tr. 40-46).  These two approaches – one based on reality and the other based on mythical units – yielded a monthly assessment that is approximately $100 less per month, per unit or over $33,000 less per month or $396,000 annually.  D.R. Horton's corporate representative testified that the "major difference" between the two approaches was that one spread the bad debt over units that "did not exist" and other was "spreading the bad debt over the unit owners that existed."  (Tr. 287).  Ultimately, after slashing the budget for amenities and removing the bad debt, D.R. Horton and the Individual Defendants, acting as its agents and on its behalf, published a budget to the actual and prospective members of the Master Association based on 681 units for $89 with reserves (Pl. Ex. 39).

These understated budgets created the misleading impression that it took exceedingly less funding to operate the Master Association than it actually did.  This resulted in three effects:  (i) deceiving prospective buyers as to the cost of ownership, causing the Master Association to publish knowing falsehoods[3]; (ii) deceiving existing unit owners and members of the Master Association as to the financial condition of the Master Association and the resources it would take to run the community; and (iii) deceived both prospective buyers and existing owners as to D.R. Horton's deficit funding obligations, and benefitted D.R. Horton by artificially reducing and concealing its deficit funding obligations.  D.R. Horton's materially false budgets created the illusion that unit ownership was less expensive than it truly was and hid the ever growing insolvency of the Master Association during the time D.R. Horton was selling units.

### *D.R Horton-Controlled Board Deleted Amenities*

As the Defendants allowed the Master Association to collect less in Assessments from the unit owners and Local Associations, the D.R. Horton-appointed Board started to slash the budgets by hundreds of thousands of dollars, unilaterally removing amenities for which D.R. Horton was obligated to provide under the Master Declaration and Bylaws.  By reducing the actual expenses, it had the effect of reducing the amount that D.R. Horton had to deficit fund. There is no record, minutes, meeting agenda, or other documentary evidence that the Board advised the members of the Master Association that amenities were being deleted from the community or the budget (Tr. 54-55; 405).  For example, the 2008 approved abated budget contained a line item of $170,607 for "Security Personnel", but that was deleted so that the 2009 budget showed zero (Pl. Ex. 39).  Similarly, the 2008 approved abated budget listed $267,931 for cable television but it was slashed to zero for 2009. *Id.*  These promised amenities that were cut

---

[3] D.R. Horton was selling units in 2009 and 2010. It sold approximately 65 units during those two years (Tr. 263).

by Defendants were very important to the unit owners and members of the Master Association
(Tr. 52).

As Defendant Albertson testified in his deposition, "[W]e were looking at ways to reduce
the level of services and cut off other services, like we did with cable.  Things to bring down the
overall expenses to the Association." (Pl. Ex. 138, P. 81, L. 8-24).  Defendant Roca, who did not
testify at trial, had testified at his deposition that "We tried to cut as many expenses as we could,
limiting certain items, removing items from the budget.  So we did what we could to bring the
expenses down  . . ." (Pl. Ex. 137, P. 211).

At this point, the D.R. Horton-appointed Board was no longer allowing the Master
Association to provide its members with the services that they were promised and entitled to when
they purchased their units in the Community.  The effect of these wholesale cuts was to lower the
Master Associations deficits and thereby to reduce D.R. Horton's deficit funding obligations.  As
Defendant Roca testified at his deposition:

> Q.  All things being equal, money coming in, being equal, the more expenses that
> the Majorca Isles Master Association had, the bigger the shortfall between money
> coming in and money going out, right?
> A.  Yes.
>
> Q.  And the bigger the check that D.R. Horton would have to write to cover that
> shortfall. Is that also right?
>
> A.  That would be pretty accurate.
>
> Q.  Okay.  So by cutting the expenses of the Majorca Isles Master Association, it
> had that benefit for D.R. Horton as the developer?
>
> A.  It had benefits for the association, because there was only a limited amount of
> money coming in, and we had to cut expenses wherever we could.

(Pl. Ex. 137, P.  214, L. 14- P. 215, L. 5).

The D.R. Horton corporate representative also testified that "[t]here was an incentive to

reduce the amount that D.R. Horton had to cover for the lack of payment by their residents, yes." (Tr. 260, L.  5-7).  By 2009, D.R. Horton was "very concerned about the amount it was required to deficit fund" (Tr. 259, L. 19-23).

The testimony indicated that the lack of D.R. Horton's promised security has been very important to the homeowners and members of the Master Association (Tr. 52).  The clubhouse "has been vandalized beyond recognition" (Tr. 183).  There had been guard gates but D.R. Horton, as the developer, did not maintain them (Tr. 89).  D.R. Horton did install a security system in the homes, but only as an alarm that would sound after the home was broken into (Tr. 89-90).  Without security, others have entered the "community and destroy[ed] the clubhouse, so that has to be completely restored" (Tr. 183).  "People can come in and out, which has been a constant problem, because parking has been an issue, vandals come in and out of the community, because there is no gate to keep them out (Tr. 90).  "There have been reports of vandalism and crime (Tr. 53).

### *The D.R. Horton Appointed Board Contracts for Services it Cannot Afford*

While the D.R. Horton-appointed Board deleted security personnel from the budget, it decided that the Master Association would instead pay for home alarm monitoring.  The D.R. Horton-controlled Board entered into a contract with the alarm monitoring company that cost approximately $7,200 a month (Tr. 154).  That was more than one-third of the monthly Assessments collected (Tr. 154; 155).  The Master Association could not afford that cost without D.R. Horton's deficit funding. *Id.*  "[T]he $7,200 a month that it cost to pay for [alarm monitoring] had to be replaced by keeping the lights on, by paying the insurance, by attending to life threatening possible conditions at the property (Tr. 154).  As a result of the D.R. Horton-appointed Board saddling the Master Association with the unmanageable debt, the monitoring

company, Specialized Home Electronics obtained a judgment and filed a claim in the underlying bankruptcy case for approximately $550,000. That sum would not have been incurred if the D.R. Horton-appointed Board did not seek to eliminate amenities for D.R. Horton's benefit and obligate the Master Association to long term debt the Board knew they could not afford.

### *The Master Association Finally Hires Legal Counsel to Collect Unpaid Assessments*

After years of neglect and inactivity by D.R. Horton and the Individual Defendants, acting as its agents and on its behalf, the amount of the unpaid assessments continued to skyrocket with approximately 47% of all unit owners' delinquent and the Assessments due from Local Associations alone totaling $407,055.44 (Pl. Ex. 48, 55). On or about September 21, 2009, the Master Association finally forwarded the delinquent unit owner accounts to a law firm and requested that the attorneys initiate collection efforts against the Local Associations for non-payment (Pl. Ex. 76).

The Master Association's legal counsel made demand to the Local Associations of Majorca I, II and III, for the payment of the delinquent Assessments identified under the then-abandoned bulk billing records (Tr. 35). This included making demand upon Majorca III for Assessments due and which were unpaid during the period the D.R. Horton-controlled Board of Directors controlled the Majorca III condominium association (P. 136, P. 107, L. 17 – P. 113, L. 13). Legal counsel advised the Master Association in writing that it could indeed choose to pursue collection actions against the individual unit owners, however, that option was:

> problematic due to accounting issues associated with the accounts. More specifically, we were advised by the [Master] Association that as monies were collected by the [Local Associations], said monies were remitted "in bulk" to the Master Association and that "first dollar' was not remitted to the Master Association as required by the Master Declaration. This presents a couple of concerns: a) it may be difficult or impossible to identify which unit(s) should receive credit for payment of the Master Association

> assessments, giving rise to possible defense to said collection
> actions and b) owners who have paid could defend such actions by
> claiming that the [Master] Association, under the control of the
> developer, failed to follow the documents …

(Pl. Ex. 76 at P. 3).  D.R. Horton's corporate representative dismissed the importance of

counsel's letter by testifying that this was just a "legal opinion" (Tr. 248, at L. 18-20).

Faced with the attorney's legal advice that these were deficit funding obligations, the D.R

Horton-controlled Board of Directors and Individual Defendants did nothing (Tr. 239).

Meanwhile, D.R. Horton and the Individual Directors, acting on its behalf and as its agents, had

access to each of the Local Association's financial records, which contained the information

necessary to build a detailed historical accounting record of all unit owner Assessments that

could be used to initiate collection actions for those delinquencies.

In that same written legal opinion, the Master Association's attorney further advised the

D.R. Horton-controlled Board of Directors that the Master Association "may choose, and

arguably has an obligation, to pursue legal action against the [Local Associations] to recover the

sums that the [Local Associations] failed to remit to the [Master] association."  (Pl. Ex. 76 at P.

3).  Obviously, if the Board of the Master Association pursued legal action against the Local

Associations, it would be implicating those Local Association board members, who were also

D.R. Horton employees, and in some instances the very same individuals that were Directors on

the Master Association Board.

D.R. Horton, through its employees and representatives, testified that the Master

Association had an obligation to collect the unpaid Assessments (Tr. 244).  But the D.R. Horton

Board never pursued any legal action. *Id.*   As a result, in 2010, the Master Association had a

$30,000 to $40,000 a month deficit (Tr. 246).  During that time, it was common for units to be

more than a year delinquent (Tr. 247). But it was the policy of D.R. Horton in the South East Florida Division that when it controls an association, to never enforce the lien rights to collect assessments (Tr. 247). As its corporate representative testified, during the time that D.R. Horton was appointing the Directors of the Master Association, there were no foreclosures (Tr. 244).

Rather than request the individual unit owner's financial records that had been maintained at the Local Associations, or seek to obtain them, Defendants sought to specially assesses the unit owners or pursue the Local Associations. However, when outside legal counsel advised that "a special assessment cannot be levied for a budget shortfall caused by low assessment revenues" and "the failure of the Local Associations to pay assessment to the Master is likely a deficit funding obligation of " D.R. Horton (Pl. Ex. 78), Defendants quietly abandoned any collection efforts to recover unpaid Assessments. (Tr. P. 238-40; 255)).

### *Financials*

The D.R. Horton-appointed Directors, including the Individual Defendants acting as agents of D.R. Horton for its benefit, manipulated the Master Association financial statements to re-characterize D.R. Horton's required deficit funding obligation as a debt that the Master Association had to repay to the developer. The Master Association 2009 financial statement showed liabilities of $71,120.39, which consisted of a held check accrual because the Master Association could not fund its written checks, accrued expenses and a small amount of prepaid assessments (Pl. Ex. 13; 60). That same balance sheet showed "Home Owners' Equity" of $430,726.48, which was identified as "Developer Contribution." *Id.* That amount was calculated as D.R. Horton's total contribution of $559,713.79 through December 31, 2009, minus the 2009 deficit of $129,848.72, resulting in the balance of $430,726.48 (Pl. Ex. 21 at "Analysis of Developer Contribution"; Pl. Ex. 123). Importantly, the D.R. Horton-appointed Board

effected the application of $129,848.72 to the D.R. Horton deficit funding obligation by taking the Home Owner Equity from the balance sheet and reclassified it as revenue that did not really exist (Tr. 65-67). Then the entire remaining Home Owners' Equity of $430,726.48 was quietly wiped out by an accountant's adjusting journal entry (Pl. Ex. 21 at "Analysis of Developer Contribution"; Tr. P. 66-77).

That $430,726.28 asset of Home Owner's Equity benefiting the Master Association was recalculated as $0 and reclassified as a new liability of $402,077 due to D.R. Horton, entitled "Due to Developer." *Id.* The net effect of these journal entries was to take all the equity out of the books and repost them as liabilities due D.R. Horton (Tr. 71). These reclassifications were conducted without notice, director meeting minutes, or any other evidence that indicates the basis for the re-classification of the Home Owners Equity.

The Master Association Balance Sheet, for the period ending December 31, 2010, issued by the D.R. Horton-appointed Board, prior to turnover, reported total assets of $728,622.81, of which $660,883.31 was unpaid accounts receivable. Of that total $660,883.31 that D.R. Horton chose to classify as an asset, $407,055.44 represents the accounts receivable which accrued at the Local Associations during the bulk billing period under the direction of the D.R. Horton-controlled Board of Directors. The D.R. Horton-controlled Board classified these accounts as assets despite the contrary opinion of their own legal counsel more than one year earlier (Pl. Ex. 76; 78). The D.R. Horton-controlled Board also chose to post a Maintenance Fee Receivable of $242,416.39 accumulated over an 18 month period, without any consideration as to their collectability, even though they suffered from the same 50% uncollectability rate (Pl. Ex. 21). Further, this Balance Sheet categorized an aggregate maintenance fee receivable into individual amounts "Due from" each Local Association. By retitling the uncollected debt, it created the

illusion that the sums were collectable (Tr. 38-39).  It also showed a liability of $402,077.80, identified as "Due to Developer"   (Tr. P. 66-77).   The Developer Contribution sum of $238,382.48 under Home Owners' Equity was the sum funded in 2010, categorized as "overfunding." *Id.*

The financials created by the D.R. Horton-appointed Board also mischaracterized the income received by the Master Association.  Although the income statements reported a line item for "Actual" "Maintenance Fees" "Revenue", this did not represent "actual" revenue received by the Master Association, but merely 100% of the amount that had been charged for Assessments by the Master Association.   (Tr. P. 63).   Even the representative of Castle Management, the company that created the report for the D.R. Horton appointed Board, did not know if the "actual" "maintenance fees" were received (Tr. 392). In 2010, the Master Association had a $30,000- $40,000 a month deficit (Tr. P. 246).

The 2010 internal financial statements were the only year-end financial documents available to the Master Association (Tr. 79; 523).  On its face, it shows a solvent entity, even though it was insolvent and was unable to pay its bills immediately after turnover (Tr. 79-80). These financials were not "clear and accurate and non-misleading" and were instead "deceitful financial statements that were changed year after year with journal entries -- and not clear journal entries" (Tr. 87).  These journal entries failed to provide any explanation or authority for the changes.

D.R. Horton and its appointed Directors did not issue audited financial statements for the year ending 2010 nor did they issue a turnover audit (Tr. 507).  A draft 2010 audit was prepared, which underscores the manipulation of the Master Association financials.  First, that draft included allowance for bad debt reduction of $454,537, which was $407,112.09 more than what

the property manager had calculated (Pl. Ex. 25).  Notably, that "analysis" of bad debt was nothing more than a simple calculation of whether the receivable was more than 12 months old: if it was less than 12 months, it was included as a "collectable" receivable (Tr. 509).  That bad debt expense would result in a balance sheet showing the Master Association as insolvent. Instead, the auditor created a draft in which he re-categorized $254,316.80 in a prior year's receivable and $238,382.48 in developer contribution equity to create $492,699.28 in phantom income for 2010 and offset the increased bad debt calculation (*Id.*; Tr. P. 66-77; 514).  Both of these categories were ultimately rooted in homeowners' equity (Tr. 76).  Without these machinations, if the uncollectable Assessments would have been posted as bad debt, the Master Association would have been insolvent on the books because the liabilities far exceeded the assets. *Id.*

As the unpaid Assessments continued to mount, the Individual Defendants, as agents of D.R. Horton and for the benefit of D.R. Horton, caused these unpaid Assessments to be recorded as "Assets" of the Master Association.  There was no evidence of any effort to collect on these "Accounts Receivable" from the Local Associations, except for the one set of demand letters sent in September 2009.  In fact, these same uncollected and uncollectable Assessments would remain on the financial statements as assets until turnover years later (Tr. 34; Pl. Ex. 50; Pl. Ex. 21).

Defendants maintained that their method of financial recordkeeping was appropriate and fair.  But that contention was undercut by the fact that, in an effort to explain the financials, none of Defendants' three witnesses -- Master Association's auditor, the property management company representative who was a Canadian chartered accountant, and a CPA expert witness -- rebutted the Chapter 11 Trustee's evidence and this Court's observations that the financial

statements were confusing, deceiving, and failed to accurately portray the financial condition of

the Master Association (Tr. 87).  D.R. Horton was "in charge of the preparation of" and

participated in the "fabrication" of these documents (Tr. 201-02)

### *Turnover of the Master Association from D.R. Horton*

By the middle of 2010, the Master Association had been a financial drain on D.R.

Horton. In fact, the year before its CFO had complained about the cost of funding the Master

Association and asked about cutting off services (Pl. Ex. 55).  In response and without notice to

the unit owners, on September 22, 2010, D.R. Horton filed the Second Amendment to the

Declaration of Master Association Covenants, Easements and Restrictions for Majorca Isles ("Pl.

Ex. 3" the "Amendment").[4]  The primary effect of the Amendment was that the development

would be cut in half.  At the time of the Amendment, D.R. Horton had sold approximately 50%

of the 681 units to be developed.  D.R. Horton's engineered reduction of the total number of

units to be developed to 355, immediately brought sold units to over 90%, thereby triggering

mandatory turnover pursuant to Florida Statute, from the developer to the unsuspecting

homeowners.  D.R. Horton would then enjoy their intended benefit of no longer having to fund

operating deficits and accelerating their departure from the operation of the community.

Consequently, the homeowners would now have to bear the burden of operating expenses,

unaffected by the reduction of units in the development, with half the number of units to share in

the cost, thus nearly doubling the cost of the unit owners' monthly Assessments.

While it had the opportunity and the obligation, the D.R. Horton-appointed Board did not

create a new right-sized budget for the one-half sized Master Association.  There was no

---

[4] D.R. Horton had a legal right to file the Amendment as it relates to D.R. Horton's development, but it had no right to create an amendment that affected D.R. Horton's obligations to the purchasers of the units under the Master Declaration and Bylaws without notice to or consent of the purchaser whose rights and benefits were unilaterally taken away by the Amendment.

turnover budget (Tr. 195-96). D.R. Horton knew that the Master Association "was going to have some difficulty" paying its bills after turnover (Tr. 262). There is no evidence that the D.R. Horton-appointed Directors even had a conversation as to what would happen to the Master Association upon turnover (Tr. 262, 266).

In anticipation of turnover of a 355 unit community to the unit owners, the D.R. Horton-appointed Board did nothing, with disastrous results. As fiduciaries, they owed the Master Association a duty to act reasonably and in its best interests. Contrary to that obligation, the D.R. Horton-appointed Board, acting as agents of D.R. Horton:

a)  Did not advise the members of the Master Association of the extent of the deficit funding (the full nature of which had been concealed from the unit owners), or that the Master Association could not pay its bills without the deficit funding;

b)  Did not advise the Master Association that the calculated and published budget was woefully inadequate, even if it was fully collected;

c)  Did not write off or write down the uncollectable Assessments;

d)  Did not institute a meaningful collection program;

e)  Did not leave the Master Association with any meaningful reserves.

In short, D.R. Horton and the D.R. Horton-appointed Board took no action to advise the members of the Master Association of the inadequate revenue, the lack of collectable assets, or the extent of the Master Association's ability to function.

The D.R. Horton-appointed Board left the Master Association with a materially false and misleading financial statement for the year ended December 31, 2010, just weeks before turnover (Pl. Ex. 21). That financial statement retitled the assets consisting of uncollected Assessments, of $457,834.27, as "due from [Local Associations]", which had previously been titled

"maintenance fee receivables". That obscured the nature of the "asset" so that it was not readily apparent that these sums were hundreds of thousands of dollars of uncollected and uncollectable bulk billing Assessments. A "reader of the financial statements clearly believed that these were dues which were due, owing and collectable by the master association" (Tr. 38).

Further, the "allowance for doubtful accounts" was only $47,425.12, a fraction of the delinquent accounts of $196,516 listed on the 2010 budget, which in turn was only one-half of the amount calculated by D.R. Horton. On the income statement, it showed $477,682.26 in "actual" "maintenance fees" with a "bad debt expense" of $4,766 and an "Unpaid Maintenance-Delinquent Accounts" of $0.00. Meanwhile, the Master Association could not even deposit enough cash to cover $37,983 in checks, which were listed as a "held check accrual".

Next, the Home Owners Equity of $430,726.48 that was listed for the previous year end as an asset, was erased and re-classified as a $402,077.80 "debt" due to D.R. Horton. This had the effect of taking a line item that appeared to benefit the members of the Master Association and creating a liability in favor of D.R. Horton.

Upon turnover, the D.R. Horton-appointed Board left the Master Association with:

a) A manipulated budget that understated the bad debt by approximately $200,000;

b) A budget that was insufficient to cover expenses even if 100% was collected;

c) Collections of only 50%, with no viable collection program in place;

d) No turnover audit and deceptive financial statements, that listed $457,834.27 in uncollectable Assessments as assets and re-categorized the home owners' equity as a liability due D.R. Horton;

e) Inadequate records that were insufficient to initiate a collection program or determine the payments and charges per unit or member of the Master Association;

f)  No operating reserves and minimal capital reserves;

g)  Unaffordable contractual obligations, created by the D.R. Horton Board, such as the alarm monitoring contract that cost over one-third of the monthly Assessments collected;

h)  A stripped down budget without security, cable television, and other amenities; and

i)  Immediate insolvency.

According to the Chapter 11 Trustee's professional, there "probably wouldn't have been a bankruptcy" if there had been accounting records that did not need to be recreated, a legitimate collection program was in place, and the financial documents reflected the nature and state of the Master Association (Tr. 196).

### *Post Turnover: The Aftermath*

On or about January 11, 2011, D.R. Horton turned over the Master Association to the unit owners.  After the D.R. Horton-controlled Board of Directors' years of inaction and inattention, the Master Association could only reasonably expect to collect approximately $20,000 in Assessments to sustain a published budget of twice that amount, or approximately $40,000 per month.  Without the benefit of D.R. Horton's continued deficit funding, the Master Association was immediately insolvent.  On April 13, 2012, Debtor filed a voluntary petition under Chapter 11, of the Bankruptcy Code.  On June 12, 2012, Plaintiff was appointed Chapter 11 Trustee.

Upon being appointed, Plaintiff's professionals sought to review the individual unit owner records of Assessments. No such records existed, so the Chapter 11 Trustee "had no idea who owed what, and who had paid what, when, or how much" (Tr. 139-140).  What little information was available was in hard copy format, instead of the electronic format commonly used for such ledgers, which made it more difficult to manage and extract data.  The Chapter 11

Trustee's professional then recreated seven years of unit owner and unit specific financial records "from scratch" (Tr. 80-81; 141-43). Not only was a financial record required by statute and the Master Association governing documents, but collection counsel and counsel for the Master Association also stated that it was needed to engage in collection efforts (Tr. 81). That ledger had to be verified by the Chapter 11 Trustee for credibility (Tr. 149). The summary report alone of the account ledger reconstruction is approximately 1,000 pages (Tr. 143). With those records, the Chapter 11 Trustee knew who owed the Debtor money, issued estoppel letters, negotiated payment plans and payoffs, instituted foreclosure proceedings, instructed collection counsel, and made informed decisions as to the Master Association (Tr. 146-47). It took an extraordinary amount of professional time to recreate this historical record because of the condition and non-existence of records left by the D.R. Horton appointed Board. It required approximately $200,000 of the Chapter 11 Trustee's professionals' time to recreate these records.

Upon reviewing the records, including the recreated records, the Chapter 11 Trustee was able to determine the extent of the collection deficiency and undertake a collection program. For example, of the 355 units, approximately 80 units had never paid any Assessments at all in the history of Majorca Isles (Tr. 151). The collections program included analysis of unpaid Assessments, settlements with unit owners, and management of outside counsel. The Chapter 11 Trustee's collection program included 30 foreclosure actions, 79 settlements, and collection of approximately $800,000 (Tr. 169-71). While ensuring that "critical" expenses were paid, the collection program was pursued to increase the collection percentage "and work with the homeowners on a one-by-one basis to take into account [each member's] personal situation (Tr. 82). This included 200 to 300 calls a week, sometime duplicate, asking Chapter 11 Trustee's

professionals to send them records, asking for discounts, and everything else that it took to pursue negotiations for unpaid Assessments (Tr. 169-70). As a result, the Chapter 11 Trustee doubled the amount of collections so that the Master Association is able to sustain itself on the bare bones budget that has been maintained (Tr. 155). However, that "bare bones" budget does not include security personnel or cable and the Master Association is just "limping along" (Tr. 86). Over the past four years of the day-to-day collection management program, the Chapter 11 Trustee has accumulated $350,000 worth of professional fees (Tr. 155).

The lack of a collection program had a "profound impact" on the ability of the Chapter 11 Trustee to manage the Master Association (Tr. 589). By permitting the accounts to languish, the uncollected sums grew, with only 50% of the homeowners paying Assessments, on a budget that covered only one-half of the expenses, with a deficit that was growing by hundreds of thousands of dollars a year (Tr. 589-90). As a result, the value of the aged, uncollected assessments was greatly reduced so that there was only a small fraction of recovery available from foreclosures or settlements with the current unit owners (Tr. 590). Further, by delaying any collection effort, the Master Association increased its risk that the cost of collection would exceed what it could collect due to the safe harbor provisions of residential foreclosure law; that is one reason that immediate collection activity is beneficial (Tr. 172-73). Lastly, by ignoring collection efforts, units were abandoned, so that the cabinets, refrigerators, and bathroom fixtures were vandalized or stolen (Tr. 219). As a result, these units could not be rented to generate revenue for the Master Association. *Id.*

A collection program should have been in place prior to the Chapter 11 Trustee's appointment. (Tr. 591). Under the Chapter 11 Trustee, the collection rate has reached as high as 91 percent, which is up from the previous 50% collection rate before the collection program was

instituted (Tr. 589, 591-92).    The Chapter 11 Trustee offered unrebutted and unchallenged

testimony that his office calculated $700,000-$750,000 more would have been collected if a

collection program had been in place.  (Tr. 592, 593).  Even though the increase in collections by

the Chapter 11 Trustee has left some community members very angry and upset (Tr. 184), "just

about everybody, except for the very worst cases, managed to keep their homes if they wanted to

keep their homes." (Tr. 220).

       The lack of collections and Assessment revenue had a fundamental, negative effect on the

"sprawling" Master Association physical plant (Tr. 27).    Those are the only two sources of

revenue for the Master Association: collections of unpaid Assessments and current Assessments

(Tr. 80-81).  Upon the Chapter 11 Trustee being appointed, Majorca Isles was a "significantly

stale community that was incapable of doing even the most simple tasks, pressure cleaning the

sidewalks, dealing with potholes in the street, [and] taking care of the landscaping . . ." (Tr. 177).

The community was in poor condition "and not because of anything else other than [the Master

Association's] inability to pay for ordinary maintenance" (Tr. 175).   At that point, the Master

Association was collecting one-half of the amount necessary to "manage the bare bones budget,

and even 100 percent funded, wasn't significant enough to maintain the community."  (TR. 181).

The pool has subsurface deterioration, but there were never enough funds to investigate (Tr.

183).  As a result, the pool water is constantly going green, resulting in code enforcement issues

especially with West Nile and Zika viruses (Tr. 183-84).  This seems to be a result of defective

pumps, which likely failed right after installation (Tr. 198).  The pool has never been useable

since the Chapter 11 Trustee was appointed (Tr. 183).  The tot lot has deteriorated so that the

children of the community could not use it (Tr. 184).  Similarly, the community gazebo is

unusable. *Id.*

The Chapter 11 Trustee also performed the ongoing accounting function for the Master Association. This included the monthly operating statements, cash flow management, evaluation of the needs of the community and the Master Association, cost benefit analysis, and the cash probability analysis (Tr. 156). The professional fees that accumulated in the past four years of accounting are $350,000 (Tr. 160).

The Chapter 11 Trustee engaged in litigation support, which included analysis of the balance sheets, determining the stripping of budgets, examining the journal entries, uncovering the facts relating to the deceptive accounting, and evaluating D.R. Horton's counterclaims, (Tr. 165-67). Those accumulated professional fees equal $350,000.

The unrebutted testimony indicates the Master Association would have had approximately $550,000 in reserves but for the failures of the Defendants (Tr. 185-86). Of that amount $298,000 would be capital reserves and $200,000 to $250,000 would be operating reserves, based on the value of six months of assessments at that point in time. *Id.*

### D.R. Horton Seeks Claim Against Estate

D.R. Horton seeks between $117,934 and $590,203 which it claims it gratuitously overfunded the Master Association, but no evidence was presented at trial to support any claim of overfunding.

## CONCLUSIONS OF LAW

### Counts I and II: Violation of Florida's Deceptive and Unfair Trade Practice's Act

D.R. Horton violated Florida's Deceptive and Unfair Trade Practices Act, Florida Statute 501.201, *et seq*. ("FDUTPA") based upon the clear and convincing evidence that D.R. Horton engaged in an unfair practice "that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous". *Hucke v. Kubra Data Transfer Ltd., Corp.*, 160 F.Supp.3d

1320 (S.D.Fla. 2015)(citations omitted).   Plaintiff, as the Chapter 11 Trustee of the Master Association, is "anyone aggrieved by a violation" as defined by Florida Statute 501.211(1). Plaintiff is therefore entitled to a declaratory judgment that D.R. Horton's acts and omissions, directly and through Individual Defendants acting as agents for D.R. Horton and for its benefit, violated FDUTPA by, among other things:

     1.     Publishing Master Association budgets in 2009 and 2010 that materially misstated the amounts necessary to operate the Master Association and then distributed those budgets to homeowners and prospective homeowners, all of whom were induced to become members of the Master Association;

     2.     Directly or through its agents, diverting Assessment revenue from the Master Association, thereby burdening the Master Association with a revenue shortfall for the benefit of other associations;

     3.     Creating Master Association financial statements that listed knowingly uncollectable Assessment receivables as "assets" and provided those misstated financial statements to the Master Association before and at turnover to deceive the Master Association as to the nature, extent, and amount of assets available to sustain its operations;

     4.     Manipulating the Master Association financial statements to hide the disastrous financial condition of the Master Association from the members before turnover and from its board of directors after turnover;

     5.     Manipulating the Master Association financial statements so as to re-categorize hundreds of thousands of dollars of required developer deficit funding

pursuant to Section 720.308 from homeowner's equity to a liability due to the developer

without any board of directors' minutes or notice to the Master Association.

D.R. Horton engaged in these immoral, unethical, oppressive, and unscrupulous acts and

omissions, which offend established public policy for its financial benefit.

Plaintiff, as the Chapter 11 Trustee of the Master Association is also a "person" that has

"suffered a loss" as defined by Florida Statute 501.211(2), in that he, on behalf of all creditors of

the estate, has incurred damages resulting from D.R. Horton's unfair practices and is therefore

entitled to actual damages.

Under FDUTPA, "the measure of actual damages is the difference in the market value of

the product or service in the condition in which it was delivered and its market value in the

condition in which it should have been delivered according to the contract of the parties."

*Democratic Republic of the Congo v. Air Capital Group, LLC*, 614 Fed. Appx. 460, 472 (11th

Cir. 2015)(unpublished)(citations and quotations omitted).  *See also, PODS Enterprises, LLC v.*

*U-Haul Intern., Inc.*, 126 F. Supp. 3d 1263, 1286 (M.D. Fla. 2015) ("Actual damages in this case

are the corrective advertising expenses PODS will have to incur to recover the diminished value

of its brand.").  The clearest measure of the advertised market value of the Master Association is

the 2010 Financial Statement at the Balance Sheet, in which the D.R. Horton-appointed Board

portrayed the Master Association with assets that were overstated by at least $457,854.27 for the

uncollectable Assessments from the Local Associations.  Actual damages in this case consist of

$457,854.27, which is the measure between the represented value of the Master Association that

D.R. Horton turned over and the actual value.

In addition to actual damages, Plaintiff shall be entitled to interest at 4.75% per annum from the date of turnover[5] in the amount of $123,695.92, reasonable attorneys' fees, and costs pursuant to Section 501.2105, Florida Statutes.

## COUNT III: Declaratory Relief

In Count III, Plaintiff seeks several declarations, which the Court addresses in turn. First, the Court concludes that the funds D.R. Horton contributed to the Master Association were deficit funding obligations pursuant to the Master Declaration and Section 720.308(1)(b), Florida Statutes. Second, the Parties agree that the Master Association is governed by Chapter 720, Florida Statutes, as a Homeowners' Association. Third, the acts and omissions of Defendants D.R. Horton, and its employees and agents, acting as directors of the Master and Local Associations, is a de facto conflict of interest and contrary to the obligations in violation of the Master Association, the Master Bylaws, and the governing statutes.

## COUNT IV-XI: Breaches of Fiduciary Duty
## (Individual Defendants)

Defendants Roca, Papadimitriou, Gausman, and Albertson, acting in their individual capacity as agents of D.R. Horton and for its benefit, breached their fiduciary duties of loyalty and due care to the Master Association as Directors. Each Individual Defendant was a Director as part of his or her duties as an employee of D.R. Horton. As Directors, each Individual Defendant owed the Master Association a duty of loyalty and duty of care. *McCoy v. Durden*, 155 So. 3d 399, 403 (Fla. 1st DCA 2014)(citations omitted). The Florida common law concept of fiduciary duty is similar to Justice Cardozo's famous description of fiduciary duty in *Meinhard v. Salmon,* 249 N.Y. 458, 463–64, 164 N.E. 545, 546 (1928), in which he observed that: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden

---

[5] Calculated at the latest possible date provided by Defendants, January 27, 2011

to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior ….” *Id.*

Individual Defendants Roca, Papadimitriou, Gausman, Albertson, acting as agents of D.R. Horton and for the benefit of D.R. Horton, breached the fiduciary duty of loyalty that each owed to the Master Association as a director in that each one also had simultaneous and conflicting duties to Local Associations and to their employer D.R. Horton, and chose to act in the interests of others and not the Master Association.

Defendants Roca, Papadimitriou, Gausman, Albertson, acting as agents of D.R. Horton and for the benefit of D.R. Horton, breached their fiduciary duties of due care and good faith because:

a)  No effort was made to collect the Master Associations Assessments collected by the Local Associations.

b)  No meaningful effort was made to engage in a collection program for unpaid assessments, which included failing to lien or foreclose on units for which Assessments were delinquent;

c)  No financial records relating to Assessments for 2006 until October 2007 were maintained;

d)  The “bulk billing” recordkeeping was entirely inadequate and failed to fulfill the requirements of the Master Association’s governing documents;

e)  No effort was made to correct the “bulk billing records” once the Defendants were advised of the inadequacy of the records;

f)   The unpaid Assessments that outside counsel advised was a deficit funding obligation were actually maintained as an asset and were not written off;

g)   The produced budgets for 2009 and 2010 were knowingly and materially understated, as such budgets could not pay expenses, even if 100% collected;

h)   Amenities that were deficit funding obligations of D.R. Horton were slashed; and

i)   The Master Association was not viable or solvent upon turnover.

## COUNT XII-XIII: Conspiracy to Breach Fiduciary Duty

D.R Horton and the Individual Defendants conspired to breach the Individual Defendants' fiduciary duties of loyalty and due care and good faith.  D.R. Horton and the Individual Defendants committed the following overt acts in furtherance of the conspiracy: a) D.R. Horton's appointment and the Individual Defendants' acceptance of directorships of the Local Associations while serving appointments on the Board of Directors of the Master Association; b) diverted or permitted the diversion of assessment revenue due the Master Association for the benefit of the Local Associations and D.R. Horton; c) D.R. Horton's tacit or overt encouragement and approval of the Individual Defendants acting as directors of the Master Association while laboring under a direct and obvious conflict; d) The failure of the Individual Defendants, as directors of the Master Association, to take steps to collect assessment revenue that would negatively impact sales of units D.R. Horton had for sale; e) The failure of Individual Defendants, as directors and officers of the Master Association, to record amounts due the Master Association and maintain meaningful financial records for the Master Association; and f) The failure of the Individual Defendants, as directors of the Master Association, to prepare the Master Association for turnover and adjust the Master Association budget for 2011, using information concerning the planned turnover.

## COUNT XIV: Aiding and Abetting

D.R. Horton aided and abetted the breaches of fiduciary duties that Defendants Roca, Papadimitriou, Gausman, and Albertson each owed the Master Association as a Director.  D.R. Horton provided substantial assistance or encouragement of the breaches of fiduciary duties  by engaging in acts, which include, but are not limited to, the following:

a.   Appointing Defendants Roca, Papadimitriou, Gausman, and Albertson to the Board of Directors of the Master Association and the Local Associations and leaving them in that capacity, even though the Master Association and Local Associations developed conflicting interests;

b.  Appointing Defendants Roca, Papadimitriou, Gausman, and Albertson to the Board of Directors of the Master Association while they were employed by D.R. Horton and leaving them in that capacity, even though D.R. Horton had interests which conflicted with those interests of the Master Association;

c.  Allowing and encouraging D.R. Horton employees, Defendants Roca, Papadimitriou, Gausman and Albertson, as directors of the Master Association, to refrain from collecting assessment revenue due, which would foreseeably depress the potential sale value of the units for sale by D.R. Horton;

d.  Allowing and encouraging D.R. Horton employees, Defendants Roca, Papadimitriou, Gausman and Albertson, as  directors of the  Master  Association, to fail to maintain meaningful and accurate financial records, which would foreseeably depress the potential sale value of the units for  sale by D.R. Horton by increasing the amounts due attributable to  individual unit owners.

### Damages for Breaches of Fiduciary Duties

Damages are problematic to calculate with certainty because the Master Association financial records were purposefully inadequate, deceptive, confusing, missing, and misleading. Although it is difficult to determine the precise amount of damages, the Court has "rounded down" in favor of Defendants -- for convenience.  If an intensive effort were made to determine the precise amount, it would likely be a larger amount at a counter-productive cost for the effort.

There is no doubt the harm D.R. Horton caused exceeds the amount of compensatory damages that could be proven with precise certainty.  The actual, consequential, and special damages that were proximately caused by the breaches of fiduciary duty, including conspiracy and aiding and abetting, are $3,821,005.87, which consists of the following:

a.  $200,000 for the recreation of Master Association financial records;

b.  $350,000 for the management of the day-to-day collection management program;

c.  $350,000 for Trustee accounting;

d.  $350,000 for litigation support and analysis;

e.  $298,000 in capital reserves and prejudgment interest of $80,508.99, since turnover at the statutory rate of 4.75%;

f.  $250,000 in operating reserves and prejudgment interest of $67,541.10, since turnover at the statutory rate of 4.75%;

g.  $750,000 in uncollected funds because of the absence of a collection program.

h.  $867,066 in the promised and budgeted 2008 amenities of security and cable television, which were deficit funding obligations, but unilaterally deleted for 2009 and 2010.  Prejudgment interest is also awarded at the statutory rate of 4.75% for $433,533 from December 31, 2009 in the amount of $139,241.30 and $433,533 since

December 31, 2010 in the amount of $118,648.48.

## Punitive Damages

Based upon the clear and convincing evidence, the Court concludes the conduct of the Defendants entitles Plaintiff to an award of punitive damages.  "[T]he consensus today is that punitive [damages] are aimed not at compensation but principally at retribution and deterring harmful conduct." *Exxon Ship. Co. v. Baker*, 554 U.S. 471, 492 (2008). "Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67 (1981). "[T]he reprehensibility of a defendant's conduct is the most relevant; punitive 'damages imposed on a defendant should reflect 'the enormity of his offense.'" *Action Marine, Inc. v. Contl. Carbon Inc.*, 481 F.3d 1302, 1318 (11th Cir. 2007)(citations omitted)

At all pertinent times, Defendant D.R. Horton has been guilty of intentional misconduct or gross negligence in that it:

a.  had actual knowledge that the wrongfulness of its conduct had the high probability to injure or damage the Master Association, as it did, yet despite that knowledge, it intentionally pursued that course of conduct, injuring and damaging the Master Association; or,

b.  engaged in conduct so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the Master Association, and the 355 moderate income unit owners represented by the Master Association who bought their units from D.R. Horton.

The Court also concludes that all times material, Defendant D.R. Horton's employees or agents engaged in conduct that constituted intentional misconduct or gross negligence and:

    a.  D.R Horton actively and knowingly participated in such conduct;

    b.  The officers, directors, or managers of D.R Horton knowingly condoned, ratified, or consented to such conduct; or

    c.  D.R. Horton engaged in conduct that was both malicious and grossly negligent and that contributed to the loss, damages, or injury suffered by the Master Association.

Based on the greater weight of the evidence, the Court determines that the wrongful conduct was motivated solely by greed for unreasonable financial gain and D.R. Horton, through its agents and employees, knew the conduct was certain to cause injury to the Master Association and unit owners.

While the imposition of punitive damages is intended to punish the wrongdoer, the amount is to be related to the net worth of the wrongdoer. A small punitive award could be accepted by a financially huge wrongdoer as merely the cost of doing business, and thus not accomplish the intended purpose of a punitive award to deter bad conduct. *See, e.g., Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 8:13-CV-2890-T-23AEP, 2016 WL 695972, at *13 (M.D. Fla. Feb. 22, 2016)(quoting *Owens-Corning Fiberglas Corp. v. Ballard,* 749 So.2d 483, 487 (1999))(punitive damages are dependent upon the circumstances of each case, as well as upon the demonstrated degree of malice, wantonness, oppression, or outrage found by the jury from the evidence).

In this case, the Plaintiff failed to offer evidence of the net worth of D.R. Horton. Fortunately for the Plaintiff, D.R. Horton supplemented the record with its inclusion of the fact that it is the largest residential home builder in the United States. From this admission, the Court

can infer that D.R. Horton is not a mom-and-pop organization operating from a garage but rather a very large, nationwide operation which would not get the message if the punitive award was a puny amount that might not even show up as a footnote on its financial statement. To accomplish its purpose, the punitive award needs to be significant.

An appropriate award of punitive damages in this case is $12,500,000.00. Hopefully this amount will be sufficient to deter future, unlawful, malicious conduct and otherwise fulfill the intent of punitive damages.

## Counts XV-XVI: Objection to Claim 5-1 and Equitable Subordination and Counterclaims

The remaining counts are dismissed without prejudice as the claim and any objections will be decided in the underlying Chapter 11 case.

Finally, the Court considered D.R. Horton's counterclaims but concludes they are without merit. Accordingly, Plaintiff has prevailed on all affirmative claims for relief. It is

ORDERED AND ADJUDGED that Plaintiff is entitled to total actual, compensatory, and punitive damages of $16,321,055.87 plus prejudgment interest, attorney's fees and costs, which shall be set forth in a separate judgment pursuant to Fed. R. Bankr. P. 7058.

###

**Submitted by (as amended by the Court):**
John Arrastia, Jr., Esq.
Genovese Joblove & Battista P.A.
Counsel for the Plaintiff
100 SE 2nd Street, Ste 4400
Miami, Florida 33131
Phone: 305-239-2300
E-mail: Jarrastia@gjb-law.com

Attorney Arrastia shall serve a copy of the signed order upon all interested parties and file a certificate of service with the Court